## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JOHNNY SELDERS, #S02401,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18-cv-00829-JPG** |
| | ) | |
| **DR. SANTOS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM & ORDER

**GILBERT, District Judge:**

This matter comes before the Court for consideration of a Motion for Summary Judgment filed by Defendant Dr. Santos on February 24, 2020.  (Doc. 34).  For the reasons set forth below, the Motion shall be **GRANTED** and this case **DISMISSED with prejudice**.

### PROCEDURAL HISTORY

Plaintiff Johnny Selders (Inmate No. S02401), is currently incarcerated at Lincoln Correctional Center.  He filed this civil rights action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights at Centralia Correctional Center.  (Doc. 1).  Plaintiff claims that he was denied adequate medical care for a knee injury he suffered on May 4, 2016.  (*Id*. at 5).  He asserted a single Eighth Amendment claim (Count 1) of deliberate indifference to his serious knee injury against four doctors at Centralia: Doctors Shah, Garcia, Butalid, and Santos.  (*Id*.).  On April 27, 2018, this Court screened the matter pursuant to 28 U.S.C. § 1915A and allowed Plaintiff to proceed with Count 1 against Dr. Santos.  (Doc. 6).  However, the Court dismissed the claim without prejudice against the other three doctors, who were, at most, negligent in their treatment and care of Plaintiff.  (*Id*.).

On February 24, 2020, Dr. Santos filed a Motion for Summary Judgment on the merits of Plaintiff's claim, relying primarily on Dr. Santos's affidavit (Doc. 35-1), Plaintiff's medical records (Doc. 35-2), and Plaintiff's deposition (Doc. 35-3).  (*See* Docs. 34 and 35).  Dr. Santos argues that the undisputed facts support no claim of deliberate indifference against him.  (*Id*.).  Plaintiff filed a response in opposition to the motion on July 13, 2020.  (Doc. 40).  He points out that Dr. Santos diagnosed him with a sprained knee in May 2016 that turned out to be an ACL tear requiring surgery in May 2019, and an MRI completed soon after his injury would have facilitated earlier surgical intervention.

## BACKGROUND

### A.    The Parties

Plaintiff Johnny Selders is an inmate in the custody of the Illinois Department of Corrections ("IDOC") and was housed at Centralia Correctional Center ("Centralia") at the time of his knee injury on May 4, 2016.  (Doc. 1).  He transferred from Centralia on September 25, 2016.  (Doc. 35-1, ¶ 22).  Plaintiff has since been housed at Lincoln Correctional Center ("Lincoln").  (*Id*.).

Defendant Venerio Santos, M.D., is a licensed physician who is employed by Wexford Health Sources, Inc.  (Doc. 35-1, ¶ 3).  He served as the Medical Director at Centralia at all times relevant to this action.  (*Id*.).  Relying on x-rays, examination, and observation, Dr. Santos diagnosed Plaintiff with a sprained left knee on May 5, 2016, and treated him for it over the course of more than four months, on the following dates: May 5, 2016; May 18, 2016; May 24, 2016; May 26, 2016; May 31, 2016; June 9, 2016; June 30, 2016; August 2, 2016; August 15, 2016; and September 22, 2016.  (Doc. 35-1, ¶¶ 6, 10, 12-15, 19-21; Doc. 40).  Dr. Santos's diagnosis of Plaintiff did not change during the course of treatment.

2

**B.     Plaintiff's Medical Care**

**1.     <u>Centralia</u>**

Plaintiff suffered a left knee injury while playing basketball at Centralia on May 4, 2016. (Doc. 35, ¶ 2; Doc. 40, ¶ 2).  He was taken directly to the prison's health care unit (HCU) for treatment.  (*Id.*).  Health care staff admitted him to the infirmary.  (*Id.*).  While there, Plaintiff was placed under the daily care of nursing staff.  (Doc. 35, ¶ 3; Doc. 40, ¶ 3).  He was issued crutches, a knee bandage, pain medication (as needed), and ice (as needed).  (*Id.*).

On May 5, 2016, Dr. Santos examined Plaintiff's knee for the first time.  (Doc. 35, ¶ 4; Doc. 40, ¶ 4).  Plaintiff was ambulatory and could walk without a limp.  (*Id.*).  However, he suffered from left knee swelling and pain.  (*Id.*).  Dr. Santos diagnosed him with a left knee sprain and ordered an x-ray of the injury.  (Doc. 35, ¶¶ 4-5; Doc. 40, ¶ 5).

On May 7, 2016, Plaintiff's knee was x-rayed.  (Doc. 35, ¶ 5; Doc. 40, ¶ 5).  The radiologist noted no fracture, no acute bony abnormality, and no significant arthritic change.  (*Id.*).

On May 11, 2016, Dr. Garcia saw Plaintiff in the infirmary.  (Doc. 35, ¶ 6; Doc. 40, ¶ 6). At the time, Plaintiff complained of knee pain associated with his basketball injury.  (*Id.*). Dr. Garcia ordered Motrin and Robaxin for pain.  (*Id.*).  He discouraged weight-bearing activity and recommended rest.  (*Id.*).

On May 15, 2016, Dr. Shah conducted a follow-up appointment with Plaintiff.  (Doc. 35, ¶ 7; Doc. 40, ¶ 7).  The doctor noted mild swelling and tenderness.  (*Id.*).  Plaintiff could "hardly walk."  (Doc. 40, ¶ 7).  After examining him, Dr. Shah also concluded that Plaintiff's left knee was sprained.  (*Id.*).

Prior to Plaintiff's discharge from the infirmary on May 18, 2016, Dr. Santos examined him again.  (Doc. 35, ¶ 8; Doc. 40, ¶ 8).  The doctor noted that while in the infirmary, Plaintiff

kept his leg elevated and took Motrin (600 mg) up to three times daily for pain.  (Doc. 35, ¶ 8).
He recommended continuing with this course of treatment.  (*Id*.).  In addition, Dr. Santos
recommended quadriceps strengthening exercises.  (*Id*.).  Plaintiff received a slow walking permit
for two weeks and a low bunk permit for one month.  (*Id*.).  Dr. Santos made no change to
Plaintiff's initial diagnosis with a left knee sprain.  (*Id*.; Doc. 40, ¶ 8).

At a follow-up visit on May 24, 2016, Plaintiff reported difficulty walking, pain with
weight-bearing activity, and weakness in his quadriceps.  (Doc. 35, ¶¶ 8-9; Doc. 40, ¶ 9).  However,
he showed no signs of swelling or knee tenderness.  (Doc. 35, ¶ 9).  Although Dr. Santos did not
change his diagnosis, the doctor recommended additional strengthening exercises and extended
his slow walking permit for a month.  He scheduled a one-week follow up appointment.  (*Id*.).

Dr. Santos met with Plaintiff again two days later on May 26, 2016.  (Doc. 35, ¶ 10).  He
noticed that Plaintiff was walking with a slight limp, but showed no signs of swelling, tenderness,
or other limitations of movement.  (*Id*.; Doc. 40, ¶ 10).  He ordered continued strengthening
exercises with a follow-up in two weeks.  (*Id*.).  Plaintiff claims a more in-depth examination at
this point in time would have revealed tenderness and decreased range of motion.  (Doc. 40, ¶ 10).

On May 31, 2016, Dr. Santos again met with Plaintiff to discuss his knee injury.  (Doc. 35,
¶ 11; Doc. 40, ¶ 11).  He again noted a slight limp but no swelling, tenderness, or other limitations
of movement.  (*Id*.).  Dr. Santos ordered continued strengthening exercises, Motrin, and a follow-
up in ten days.  (Doc. 35, ¶ 11).

For the first time on June 9, 2016, Dr. Santos noted that Plaintiff suffered some limitation
of movement in his left knee and weakness of his left hamstring.  (Doc. 35, ¶ 12; Doc. 40, ¶ 12).
However, Plaintiff had no complaints of knee pain.  (Doc. 35, ¶ 12).  Dr. Santos issued Plaintiff a

permit for the "[o]ver 40 [years old]" gym for knee strengthening exercise.  (*Id*.).  He was still receiving Motrin for pain at that time.  (*Id*.).

On June 30, 2016, Dr. Santos met with Plaintiff again.  (Doc. 35, ¶ 13; Doc. 40, ¶ 13).  The doctor observed no limping, no swelling, and only slight tenderness.  (*Id*.).  He extended Plaintiff's "[o]ver 40" gym pass for two months.  (*Id*.).

On July 12, 2016, a nurse met with Plaintiff and recorded complaints of pain and swelling.  (Doc. 35, ¶ 14; Doc. 40, ¶ 14).  Although the nurse noted that Plaintiff continued using the yard for basketball games, Plaintiff explained that he only used the yard and gym to complete his strengthening exercises.  (*Id*.).  The nurse recommended an appointment with a physician.  (*Id*.).

Dr. Garcia met with Plaintiff the next day on July 13, 2016.  (Doc. 35, ¶ 15; Doc. 40, ¶ 15).  Plaintiff asserts that Dr. Garcia did not actually examine him.  (Doc. 40, ¶ 15).  In response to Plaintiff's complaints of pain, the doctor ordered Robaxin and a Medrol dose pack for pain.  (Doc. 35, ¶ 15).  He ordered a knee brace and another x-ray.  (*Id*.).  However, Dr. Garcia's diagnosis of Plaintiff's injury did not change.  (*Id*.).  Plaintiff was scheduled for a follow-up appointment in two weeks.  (*Id*.).

When Dr. Garcia saw Plaintiff on July 27, 2016, he reported that the pain medication helped control his pain.  (Doc. 35, ¶ 16, Doc. 40, ¶ 16).  However, Plaintiff continued to experience slight swelling.  (*Id*.).  The doctor renewed Plaintiff's prescription for Robaxin (twice daily) and added a prescription for Naprosyn (500 mg twice daily).  (*Id*.)  He ordered a follow-up appointment one week later.  (*Id*.).  Plaintiff felt his complaints were not taken seriously.  (Doc. 40, ¶ 16).

On August 2, 2016, Dr. Santos again noted a "slight" atrophy of Plaintiff's quadriceps but no other symptoms during his examination.  (Doc. 35, ¶ 17; Doc. 40, ¶ 17).  He extended the gym permit for another two months and ordered a follow-up appointment.  (*Id*.).

Dr. Santos saw Plaintiff for shortness of breath on August 15, 2016. (Doc. 35, ¶ 18; Doc. 40, ¶ 18). While in the asthma clinic, Plaintiff ambulated without a limp and showed no other symptoms of knee injury. (*Id.*). He had a normal heartbeat and clear lungs. (*Id.*).

On September 22, 2016, Dr. Santos met with Plaintiff about his knee one last time. (Doc. 35, ¶ 19; Doc. 40, ¶ 19). Plaintiff had no limp, no swelling, no pain, and no tenderness. (Doc. 35, ¶ 29). The doctor ordered continued strengthening exercise, extended his gym permit for three months, and prescribed him Motrin (600 mg three times daily) as need for pain. (*Id.*). He made no change to Plaintiff's diagnosis. (*Id.*).

 **2.**  <u>**Lincoln**</u>

Plaintiff transferred to Lincoln on or around September 25, 2016. (Doc. 35-1, ¶ 20; Doc. 40, ¶¶ 20-21). Dr. Kotterman examined him for the first time on October 12, 2016. (Doc. 35-1, ¶ 21; Doc. 40, ¶ 21). At the appointment, Plaintiff was unable to extend his left leg to the same degree as his right, and he was unable to flex over 90 degrees. (*Id.*). The doctor noted tenderness in the border of the patella but no laxity or swelling. (Doc. 35-1, ¶ 21). Dr. Kotterman issued a permit for crutches (one month), low bunk (six months), and Diclofenac[1] (75mg, twice daily) (as needed). He questioned whether Plaintiff suffered a meniscal injury. (*Id.*). Dr. Kotterman scheduled a follow-up with Plaintiff for one month later. (*Id.*; Doc. 40, ¶ 21).

The doctor met with Plaintiff again on December 2, 2016. (Doc. 35-1, ¶ 22). He observed no swelling, no laxity, and no pain. (*Id.*). However, Plaintiff's range of motion was 5-60 degrees in his left leg, and his left thigh circumference measured 4.8 centimeters less than his right thigh. (*Id.*). He now theorized that Plaintiff suffered a meniscal injury. (*Id.*).

---

[1] This is a non-steroidal anti-inflammatory medication used to treat pain and inflammation.

Plaintiff was referred to a physical therapist for evaluation on December 8, 2016.  (Doc. 35-1, ¶ 23; Doc. 40, ¶ 23).  Upon examination by a physical therapist on December 21, 2016, Plaintiff was diagnosed with chronic left knee pain, muscle atrophy, and decreased range of motion.  (Doc. 40, ¶ 24).  The physical therapist recommended more strengthening exercises, use of a knee support, and an MRI for a suspected ACL injury.  (*Id*.).

Almost six months later on June 15, 2017, Plaint underwent an MRI.  (Doc. 35-1, ¶ 25).  The radiologist found a chronic partial rupture of the ACL and a longitudinal tear of the posterior horn lateral meniscus.  (Doc. 35-1, ¶ 25; Doc. 40, ¶ 25).  Plaintiff was sent to an off-site orthopedic specialist on July 5, 2017, August 16, 2017, and May 23, 2018.  (Doc. 35-1, ¶¶ 26-28).

At his first appointment with the specialist on July 5, 2017, Dr. Kefalas diagnosed Plaintiff with "[l]eft knee pain and stiffness [and an] ACL deficient left knee."  (Doc. 35-1, ¶ 26; Doc. 40, ¶ 26).  The specialist injected Plaintiff's knee with a local anesthetic and Triamcinolone[2] to reduce inflammation.  (*Id*.).  He also recommended continued strengthening exercises.  (*Id*.).

At his second appointment on August 16, 2017, the specialist observed Plaintiff ambulating and bearing weight on his knee "as tolerated."  (Doc. 35-1, ¶ 27).  He found that the knee had 5-90 degrees of flexion and no swelling.  (*Id*.).  He recommended continued use of a knee support, stretching, and therapy.  (*Id*.; Doc. 40, ¶ 27).  The specialist also informed Plaintiff that possible orthoscopy would be ordered if his knee continued showing signs of instability.  (Doc. 40, ¶ 27).

At the third appointment on May 23, 2018, Dr. Kefalas observed that Plaintiff had no problem ambulating, no pain, and no swelling.  (Doc. 35-1, ¶ 28).  He had 0-90 degrees of flexion.  (*Id*.).  The doctor recommended physical therapy to help with stiffness.  (*Id*.).  The parties offer no explanation for what treatment Plaintiff received, or was denied, in the year that followed.

---

[2] This medication is a corticosteroid that reduces swelling, itching, and redness.

On May 9, 2019, Plaintiff underwent surgery to repair a partially torn ACL. (Doc. 35, ¶ 38; Doc. 40, ¶¶ 30-31, 38). Plaintiff testified at his deposition that the treatment of his pain (through the delivery of pain medication or delays in the same) forms no basis of his claim. (Doc. 35, ¶¶ 34-35). Plaintiff readily admits that he refused to take pain medication. (Doc. 40, ¶ 34). He instead challenges Dr. Santos's misdiagnosis of his injury as a sprain and the doctor's treatment of the injury with strengthening exercises, anti-inflammatory medication, and pain medicine, instead of an MRI and surgery. (Doc. 35, ¶¶ 33, 36-37).

## LEGAL STANDARD

Summary judgment is appropriate only if the moving party can show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celetex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the burden of establishing that no material facts are genuinely disputed. *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004). Any doubt about the existence of a genuine issue must be resolved in favor of the nonmoving party. *Id.*

When presented with a motion for summary judgment, the Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC,* 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted). The Court must instead "view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

8

## DISCUSSION

Plaintiff's claim against Dr. Santos is governed by the Eighth Amendment.  U.S. CONST., amend. VIII.  This Amendment prohibits cruel and unusual punishment of prisoners and safeguards them against pain and suffering that serves no penological purpose.  *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  When analyzing an Eighth Amendment claim for the denial of adequate medical care, the Court undertakes a two-part inquiry.  *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005).  First, the Court must determine whether the plaintiff suffered from a sufficiently serious medical condition (*i.e.*, an objective standard).  *Id*.  The parties do not dispute that Plaintiff's knee injury satisfies this standard.  Second, the Court must determine whether the defendant responded with deliberate indifference (*i.e.*, a subjective standard).  *Id*.  The pending summary judgment motion hinges on this second inquiry.

Prison medical staff violate the Eighth Amendment if they respond to a plaintiff's serious medical condition with deliberate indifference, by intentionally disregarding a known serious medical condition that poses an excessive risk to an inmate's health.  *Holmes v. Shah*, 748 F. App'x 72, at *73 (7th Cir. 2019) (citations omitted).  The record is devoid of evidence supporting any claim that Dr. Santos knew of and disregarded Plaintiff's serious medical condition.

On the contrary, the undisputed facts show that Dr. Santos actively treated Plaintiff's knee injury while he was incarcerated at Centralia.  The doctor initially diagnosed the injury as a sprain using a combination of observation, examination, and consideration of Plaintiff's subjective complaints.  Dr. Santos completed this evaluation and made the initial diagnosis without delay on May 5, 2016, one day after the injury.  The doctor also ordered x-rays to confirm the diagnosis, and the x-ray results were consistent with the diagnosis.

During the next 4½ months, Plaintiff received ongoing medical care for his knee injury. Dr. Santos met with Plaintiff to discuss and modify his treatment plan on at least ten separate occasions: May 5, 2016; May 18, 2016; May 24, 2016; May 26, 2016; May 31, 2016; June 9, 2016; June 30, 2016; August 2, 2016; August 15, 2016; and September 22, 2016.  (Doc. 35-1, ¶¶ 6, 10, 12-15, 19-21; Doc. 40).  The doctor treated Plaintiff using a combination of rest, prescription pain relievers, and strengthening exercises.  To aid his recovery, Plaintiff received crutches, a slow walking permit, a low bunk permit, and a gym permit.  Dr. Santos extended the permits, as necessary, to assist in Plaintiff's recovery.  Dr. Santos also explained that recovery from a sprain can take five or more months.  (Doc. 35-1, ¶ 32; Doc. 40, ¶ 32).

During this same time period, Plaintiff received care from other medical staff at Centralia, including numerous nurses and three other doctors (Butalid, Shah, and Garcia).  These doctors agreed with the initial diagnosis made by Dr. Santos.  Shortly before Plaintiff's transfer, Dr. Santos examined him one last time on September 22, 2016, and he made no change to the diagnosis.

Following Plaintiff's transfer to Lincoln, he was seen by medical staff (Dr. Kotterman and an outside physical therapist) who began to develop a different diagnosis.  Still, an MRI was not performed for another nine months.  Even after imaging revealed an ACL injury resulting in his referral to a specialist, Plaintiff's treatment with strengthening exercises and pain medication continued, in much the same manner, until May 2019 when he underwent surgery.

Although Plaintiff preferred a different course of treatment for his knee injury including an early MRI, his disagreement with the chosen course of treatment is not enough to create a triable claim of deliberate indifference.  *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010); *Harper v. Santos*, 847 F.3d 923, 927 (7th Cir. 2017).  Deliberate indifference occurs when a doctor's treatment decision represents "such a substantial departure from accepted professional judgment .

10

. . as to demonstrate that he did not base the decision on such a judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 682 (7th Cir. 2008) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996)).  The Seventh Circuit has explained that an MRI is simply a "diagnostic tool," and the "decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'"  *See Pyles v. Fahim*, 771 F.3d 403, 411 (2014) (citing *Estelle*, 429 U.S. at 107) (decision by doctor not to order an MRI did not depart substantially from accepted professional norms).  In fact, Dr. Shah, Garcia, and Butalid implicitly endorsed this decision.

To survive summary judgment, Plaintiff needs to provide at least some evidence that Dr. Santos intentionally disregarded a known serious medical condition.  Even viewing the record in the light most favorable to Plaintiff, however, no evidence suggests that Dr. Santos ignored his knee injury or provided treatment that substantially departed from accepted professional judgment.  *See Pyles*, 771 F.3d at 411.  At most, the doctor's decision not to complete an MRI amounts to negligence.  However, negligence, gross negligence, or even recklessness does not support an Eighth Amendment claim.  *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006).  Accordingly, Dr. Santos is entitled to summary judgment.

### DISPOSITION

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 34) is **GRANTED**.  **COUNT 1** is **DISMISSED with prejudice** against Defendant **DR. SANTOS**.

If Plaintiff wishes to appeal this dismissal, his Notice of Appeal must be filed with this Court within thirty days of the entry of judgment.  FED. R. APP. P. 4(a)(1)(A).  A Motion for Leave to Appeal *In Forma Pauperis* should set forth the issues Plaintiff plans to present on appeal.  *See* FED. R. APP. P. 24(a)(1)(C).  If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee irrespective of the outcome of the appeal.  *See* FED. R. APP. P. 3(e); 28 U.S.C.

§ 1915(e)(2); *Ammons v. Gerlinger*, 547 F.3d 724, 725-26 (7th Cir. 2008); *Sloan v. Lesza*, 181 F.3d 857, 858-59 (7th Cir. 1999).  Moreover, if the appeal is found to be nonmeritorious, Plaintiff may also incur a "strike."  A proper and timely motion filed pursuant to Federal Rule of Civil Procedure 59(e) may toll the 30-day appeal deadline.  FED. R. APP. P. 4(a)(4).  A Rule 59(e) motion must be filed no more than twenty-eight (28) days after the entry of the judgment, and this 28-day deadline cannot be extended.  However, a Rule 60(b) motion for relief from a final judgment, order, or proceeding does not toll the deadline for an appeal.

The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED**.

**DATED: 9/30/2020**                              s/J. Phil Gilbert
                                                  **J. PHIL GILBERT**
                                                  **United States District Judge**

12